**STATE of Minnesota, Respondent,**

v.

**Rolando Thomas ALAYON, Appellant.**

**No. C5–89–1768.**

Court of Appeals of Minnesota.

May 1, 1990.

Review Granted June 26, 1990.

630

Hubert H. Humphrey, III, Atty. Gen., Thomas Foley, Ramsey County Atty., Robert A. Plesha, Asst. County Atty., St. Paul, for respondent.

Phillip S. Resnick, Resnick & Patterson, Minneapolis, for appellant.

Considered and decided by LANSING, P.J., and PARKER and RANDALL, JJ.

## OPINION

PARKER, Judge.

Appellant Rolando Alayon was charged with distribution of cocaine, two counts of failure to affix tax stamps, and possession of cocaine with intent to distribute. At the *Rasmussen* hearing the trial court found that the warrantless entry into the house was based upon probable cause and exigent circumstances. The trial court also determined that Alayon had voluntarily consented to a search of the premises. On August 16, 1989, the trial court adjudicated Alayon guilty of the charged offenses. Alayon argues on appeal that the trial court erred by not suppressing evidence found in the warrantless search. We reverse.

## FACTS

On March 29, 1989, Sergeant Frank Zaruba arranged through an informant for the purchase of 3.5 grams of cocaine. Zaruba drove to the parking lot of a restaurant and met Merle Jones and Rolando Espinosa. After negotiating the purchase, both Jones and Espinosa left to get the cocaine while Zaruba remained at the parking lot. Zaru-

ba had not yet paid for the cocaine. Surveillance officers followed Jones and Espinosa and observed their vehicle park in front of 81 or 83 East King in St. Paul. The officers believed Espinosa entered one of the two residences. Approximately 20 minutes later, Espinosa returned to the parking lot and exchanged the cocaine for the money. After the purchase, Espinosa and Jones did not return to the area of East King Street.

On March 30, 1989, Zaruba arranged for another purchase of cocaine. Zaruba met Jones and Espinosa in the same restaurant parking lot, where it was agreed that Zaruba would follow Jones and Espinosa to another location because Zaruba refused to pay for the cocaine sight unseen. The two vehicles parked in the area of Stevens and Livingston. Espinosa began walking south on Livingston to King Street, turned on King Street and walked east toward 81 or 83 East King Street. Another surveillance officer, Michael Carter, observed Espinosa enter either 81 or 83 East King. Espinosa returned to his vehicle and gave something to Jones. Jones then came back to Zaruba's vehicle and gave him the cocaine. Both Espinosa and Jones were then arrested.

Because the money had not been exchanged, the officers believed the source would be expecting payment. At this point, Carter told Sergeant Neil Nelson that it was his "best guess" that the source of the cocaine was 81 East King. Carter did not actually see Espinosa enter the premises. Carter told Nelson that Espinosa went into a white house with an open porch and pillars. 81 East King has an open porch and pillars, while 83 East King does not. Additionally, Carter believed that if a door had opened at 83 East King, he would have observed it. He did not; therefore, the officers believed 81 East King to have been the source of the cocaine.

Nelson knocked on the door of 81 East King and appellant Alayon answered the door. Nelson testified he told Alayon that "Jose" had sent him up there with the money. At this point, Alayon frowned and glanced at the street. Sergeant Nelson then pulled out the money and told Alayon that Espinosa had gotten into a fight and that was why he was delivering the money. Alayon then nodded his head, but did not take the money or reply. During this encounter, the front door was partially open. Alayon began to close the front door and open the screen door at the same time. Nelson testified he believed that because the door was being closed, there would no longer be an opportunity to "secure" or "protect" the premises, so he drew his gun and ordered Alayon to the floor. Nelson then stepped into the house and ordered two females, Miriam Montanez and Luz Cotto, to remain seated in the living room. Very shortly after Nelson's entry, other surveillance officers entered the house with their guns drawn. A sweep of the house was performed to identify other occupants.

Nelson then asked Montanez if he could search the premises and Montanez orally agreed. Alayon also agreed to allow a search of the house and during the search was cooperative. Alayon was asked if cocaine was in the house and he responded that there was and showed them its location and a scale in a kitchen cabinet.

Alayon was then formally placed under arrest and given *Miranda* warnings. He acknowledged an understanding of the warnings and confessed to selling an ounce of cocaine earlier that day to Espinosa. A search performed incident to the formal arrest recovered $1,493. Alayon confessed that this money had been obtained from the sale of drugs.

### ISSUES

1. Was the warrantless search of a house supported by probable cause and exigent circumstances?

2. Was Alayon's consent to the search voluntarily given?

### DISCUSSION

#### I

A warrantless search of a house is constitutionally permissible if (1) there is probable cause for the search, and (2) there

are exigent circumstances requiring immediate action. *State v. Mollberg,* 246 N.W.2d 463, 468 (Minn.1976). The state initially argues that the officers needed only a reasonable suspicion of criminal activity in order to detain Alayon and seize the house pending a search warrant. We believe this to be an incorrect statement of the law applicable to the facts of this case. As the United States Supreme Court stated, the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York,* 445 U.S. 573, 585–86, 100 S.Ct. 1371, 1379–80, 63 L.Ed.2d 639 (1980) (citation omitted). The fourth amendment does not allow seizure of a house upon a showing of reasonable suspicion.

■ The state next argues that probable cause existed because of Alayon's actions at the door. We disagree. Carter testified it was his "best guess" that the source of the cocaine was 81 East King. To investigate further, Nelson attempted to deliver the money to pay for the drug purchase. Nelson's meeting at the front door with Alayon produced merely a frown, a glance and a nod; Alayon did not take the money. These equivocal actions will not support an objective determination that the occupants of 81 East King had additional evidence of the crime the officers were investigating. Moreover, the officers were already in possession of the cocaine.

■ The state argues that any delay in payment to Alayon would have alerted him to Espinosa's and Jones' arrest, that any evidence which might have been in the house would have been destroyed or removed, and that this constituted an exigency justifying a warrantless entry. We do not believe exigent circumstances were present. "Whether the exigencies of a situation are sufficient to allow a warrantless search depends upon the totality of the circumstances." *Mollberg,* 246 N.W.2d at 469. One federal court has defined "exigent circumstances" by enumerating six factors which must be met before exigency justifies a warrantless entry. *Dorman v. United States,* 435 F.2d 385, 392–93 (D.C. Cir.1970). In turn, the Minnesota Supreme Court has stated that the *Dorman* analysis

should be used only as a guideline in determining whether exigent circumstances existed. *State v. Lohnes,* 344 N.W.2d 605, 611 (Minn.1984). The *Lohnes* court listed the following six *Dorman* factors:

First, that a grave offense is involved, such as a crime of violence; second, that the suspect is believed to be armed; third, that there be a clear showing of probable cause to believe the suspect committed the crime; fourth, strong reason to believe the suspect is on the premises; fifth, a likelihood the suspect will escape if not swiftly apprehended; sixth, that although the entry may not be with consent, it must be peaceable.

*Lohnes,* 344 N.W.2d at 611 (quoting *State v. Lasley,* 306 Minn. 224, 232, 236 N.W.2d 604, 609 (1975), *cert. denied,* 429 U.S. 1077, 97 S.Ct. 820, 50 L.Ed.2d 796 (1977)).

The first *Dorman* factor, the seriousness of the offense, weighs in Alayon's favor. Although possession of cocaine is a serious offense, it is not an offense of violence. Second, the officers had no reason to believe Alayon was armed. Third, the state has not made a showing of probable cause to believe there was additional cocaine within the home. However, there was reason to believe Alayon was on the premises, but there is no evidence to indicate he would escape. Last, the officers' entry with drawn guns cannot be characterized as peaceable.

Under the totality of the circumstances, the state's contention that exigent circumstances existed is arbitrary. Zaruba did not pay for the cocaine before receiving it in the first purchase. Additionally, the officers knew neither Espinosa nor Jones had returned to the 81 East King area on March 29 after Zaruba paid for the cocaine. The same mode of payment was utilized in the second purchase. Thus, there is no evidence in the record to indicate that Alayon perceived any police participation in the drug purchase. Consequently, there was no reason to search the house without a warrant.

■ We also note that any exigency which might have existed was created by the officers' own actions. It was the officers' decision not to pay for the cocaine

until it was delivered to them, to arrest Espinosa and Jones before they returned to the premises to pay for it and attempt again to observe them. Any exigency created due to Alayon not receiving the drug money was solely due to the officers' tactical decisions.

## II

■ Police officers testified their plan was to seize the house and apply for a warrant. No application was made, they testified, because consent was volunteered for the search. "To justify a warrantless search based on voluntary consent, the state must prove the consent was freely and voluntarily given." *State v. Schweich,* 414 N.W.2d 227, 230 (Minn.Ct.App.1987) (citation omitted). Voluntariness of consent is a finding of fact made by the trial court after considering the totality of the circumstances. *Id.* (citation omitted).

The state argues that Alayon's consent was voluntary, since all the officers' guns were holstered when it was given. This seems disingenuous. We have here an arrest without probable cause, a room full of police officers with drawn guns and no attempt to secure a search warrant—indeed, not even a phone call to see if a judge was available. Under the totality of these circumstances, no issue of consent can arise. *See United States v. Maez,* 872 F.2d 1444, 1455 n. 14 (10th Cir.1989) (presence of armed SWAT team members with rifles pointed constituted a "frightening scene" and served to invalidate consent to search).

## DECISION

The officers conducted a warrantless search of the premises which was not supported either by probable cause or exigent circumstances. Moreover, the search was not conducted after a voluntary consent. The trial court erred in admitting the evidence. *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417–18, 9 L.Ed.2d 441 (1963).

Reversed.